IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

| | | |
|---|---|---|
| TEMPEST HORSLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 13-321 |
| | ) | |
| JESSICA TRAME, in her official | ) | |
| capacity as Chief of the Firearms | ) | |
| Services Bureau, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Defendant, JESSICA TRAME, by and through her attorney, Lisa Madigan, Attorney General for the State of Illinois, and hereby submits her memorandum of law in opposition to Plaintiff's motion for summary judgment and in support of Defendant's cross-motion for summary judgment, stating as follows:

**INTRODUCTION**

This case involves a challenge to the Firearm Owners Identification ("FOID") Card Act (430 ILCS 65/0.01 *et seq.*). Plaintiff is a 19-year old who wants a FOID card so that she can legally purchase a firearm. Because she is under 21, to obtain a FOID card, she must obtain the written permission of a parent or legal guardian, 430 ILCS 65/4(a)(2)(i), or seek an exception to that requirement through an appeals process, 430 ILCS 65/10(c). Plaintiff contends that the FOID Card Act violates her right to keep and bear arms pursuant to the Second and Fourteenth Amendments to the United States Constitution. (Doc. #1, Compl. ¶ 13.) Plaintiff seeks an injunction requiring Defendant to process FOID card applications from individuals between 18 and 21, including hers,

1

without requiring the consent of a parent or legal guardian, and prohibiting Defendant from denying applications from individuals between 18 and 21, including hers, based on age. Defendant now responds to Plaintiff's motion for summary judgment and also submits a cross-motion for summary judgment.

This Court should deny Plaintiff's motion and grant judgment in Defendant's favor for three independent reasons:

*First*, because Plaintiff has failed to exhaust her options under state law for obtaining a FOID card, her claims are not ripe or otherwise appropriate for review at this time.

*Second*, Illinois's restrictions on access to firearms for individuals under 21 do not implicate the rights protected by the Second Amendment (and applied to the States through the Fourteenth Amendment, *McDonald v. City of Chi.*, 130 S. Ct. 3020, 3050 (2010)).

*Third*, even if this Court were to conclude that the Second Amendment is burdened by the FOID Card Act's restrictions on those under 21, Illinois's regulation of gun ownership by such individuals would pass constitutional muster as substantially serving the important government interests of "preventing armed mayhem," *U.S. v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010 (en banc), and of ensuring compensation to those injured by firearms. Likewise, the statute survives strict scrutiny, were strict scrutiny to apply.

## THE STATUTORY SCHEME

The FOID Card Act prohibits, with certain exceptions, an individual from acquiring or possessing firearms or ammunition in Illinois unless she holds a FOID card. 430 ILCS 65/2. The Act requires an individual under the age of 21 who wishes to obtain a FOID card to have the written consent of a parent or legal guardian who is not disqualified from obtaining a FOID card.

430 ILCS 65/4(a)(2)(i). A parent or guardian who provides such consent "shall be liable for any damages resulting from the applicant's use of firearms or firearm ammunition." 430 ILCS 65/4(c).

The parental consent requirement for gun possession by those under 21 has exceptions, however. For example, even without a FOID card, people under 21 can use firearms for hunting under certain circumstances. 430 ILCS 65/2(14). Moreover, and directly relevant to this case, individuals denied FOID cards due to their age and lack of parental consent can appeal to the Director of the Illinois Department of State Police ("Director"), 430 ILCS 65/10(c), and the Director then may issue a FOID card if he determines that "granting relief would not be contrary to the public interest," 430 ILCS 65/10(c)(3), and would not violate federal law, 430 ILCS 65/10(c)(4). *See also* 20 Ill. Admin. Code § 1230.70(d)(3) (in such appeal, applicant under 21 who does not have a parent or guardian must submit "two personal references regarding his or her suitability to possess firearms") (effective Dec. 31, 2013); 20 Ill. Admin. Code § 1230.70(d)(6) (relief may be granted if the "Director is satisfied that substantial justice has not been done"). Should the Director deny such relief, the individual has the right to seek judicial review. 430 ILCS 65/11. Thus, contrary to Plaintiff's claims, there is an "alternative to parental consent" (P.Br. at 2), and Illinois does not impose a "total ban on gun possession by 18 year olds" who do not have parental consent, (*id*. at 14).

## ARGUMENT

### I.   Plaintiff's Claims Are Not Ripe Or Appropriate For Review At This Time

As a threshold matter, Plaintiff's claims are not ripe and are not justiciable because she has not availed herself of her right to appeal to the Director as provided under the Act. (Ex. 1, Affidavit of Trame ¶ 4.) Therefore, Plaintiff (as of yet) has not been injured by Defendant in a way that would allow her to bring either a facial or an as-applied challenge to section 4(a)(2)(i) of the FOID

Card Act. Because Plaintiff has a concrete, non-futile opportunity to seek and obtain a FOID card through the procedures discussed above, her Second Amendment claim should be dismissed as not justiciable based on standing, ripeness, exhaustion, and constitutional avoidance principles.

A plaintiff has standing under Article III of the United States Constitution to seek facial invalidation of a statute (at least outside the First Amendment context) only if he "demonstrates that he suffered an injury in fact, the defendant's actions caused the injury, and the remedy he seeks would address the injury." *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012). Here, as noted, Plaintiff was not injured in fact because she still may be able to obtain a FOID card, despite being under 21 years old and not having written parental consent. Moreover, "[a] claim is unripe when critical elements are contingent or unknown. When, for example, a property owner alleges that general regulation affects his land in some special way, the claim is not ripe until all efforts to avoid the restriction . . . have been exhausted." *Marusic Liquors, Inc. v. Daley*, 55 F.3d 258, 260 (7th Cir. 1995). Again, all avenues to avoid the restriction on Plaintiff's gun ownership have not been exhausted, and thus her claim is not ripe. In effect, Plaintiff is making an inquiry into the legal consequences of a hypothetical act that may or may not occur in the future – a final denial of her request to obtain a FOID card on the basis that she is under 21 years old.

A corollary to Article III standing is the rule that a court may not decide abstract questions and must avoid constitutional questions whenever possible. *See Brandt v. Vill. of Winnetka*, 612 F.3d 647, 650 (7th Cir. 2010). Based on these prudential considerations, even if a plaintiff satisfies the criteria for standing and ripeness under Article III, the court may decline to hear the case on the basis that "'the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to those litigations best suited to assert a particular claim.'" *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289,

294 (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99-100 (1979)). Because Plaintiff may still be able to obtain a FOID card, she is not best suited to assert a Second Amendment challenge to what she inaccurately describes as "total ban on gun possession," (P.Br. at 14), for individuals under 21 years old who lack parental consent.

Finally, Plaintiff cannot seek relief on behalf of anyone but herself. A facial challenge requires a showing that a statute is "unconstitutional in all of its applications," *Ezell v. City of Chi.*, 651 F.3d 684, 698 (7th Cir. 2011) (citing *Wash. State Grange v. Wash. State Republican Party*, 553 U.S. 442, 449 (2008) (citing *U.S. v. Salerno*, 481 U.S. 739, 745 (1987))), but Plaintiff does not even challenge the Act's application to those under 18. And although Plaintiff purports to seek an injunction on behalf of all 18-20 year-olds, she does not try to establish that the requirements the Act imposes on an individual whose parents do consent to their gun ownership raise constitutional concerns.

## II.   Illinois's Restrictions on Gun Ownership for Those Under 21 Years Old Do Not Violate The Second Amendment

The Second Amendment, which protects "the right of the people to keep and bear Arms," U.S. Const. amend. II, is not absolute. Some activity simply does not fall within the protection of the Second Amendment. Thus, judicial review under the Second Amendment proceeds in two steps. The Court must answer a "threshold" question: whether "the restricted activity [is] protected by the Second Amendment in the first place." *Ezell*, 651 F.3d at 701. Only if the historical evidence suggests that the regulated activity falls within the Second Amendment's scope must the Court proceed to the second step: means-end scrutiny. *Id.* at 703.

Here, the Court need not go beyond the threshold question. The historical evidence establishes that restrictions on gun ownership by people under 21 are the kind of "longstanding

prohibitions," *Dist. of Columbia v. Heller*, 554 U.S. 570, 625 (2008), that fall outside the Second Amendment's scope. The Second Amendment was not originally understood to include the same right to keep and bear arms by individuals under 21 as enjoyed by those 21 and older. Moreover, gun restrictions on people under 21 are longstanding indeed. Nevertheless, should the Court go beyond the threshold question, section 4(a)(2)(i) of the FOID Card Act easily satisfies intermediate scrutiny because the restrictions are substantially related to important government interests. Indeed, the Act meets strict scrutiny if it applies.

### A.  Gun Restrictions On Individuals Under 21 Years Old, The Historical Age of Majority, Are "Longstanding" And Do Not Implicate the Second Amendment.

The Supreme Court has confirmed that legislatures may exclude categories of people from the right to keep and bear arms. For example, in *Heller*, the Court instructed: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," which are "presumptively lawful." 554 U.S. at 626-27 & n.26. Thus, the Illinois General Assembly is "not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons." *Skoien*, 614 F.3d at 641(upholding prohibition on firearms possession by those convicted of misdemeanor crimes of domestic violence). The first question before this Court, therefore, is whether the challenged restrictions even implicate Second Amendment rights.

Several courts have already concluded that restrictions on gun ownership and possession by 18-20 year-olds do not raise constitutional concerns because they are "consistent with the "longstanding tradition of age-and-safety-based restrictions on the ability to access arms." *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives (BATFE)*, 700 F.3d 185, 203

(5th Cir. 2012), *cert. pending* No. 13-137; *see also Nat'l Rifle Ass'n of Am., Inc. v. McCraw (McCraw)*, 719 F.3d 338, 347 (5th Cir. 2013), *cert. pending* No. 13-390 (same regarding Texas statute restricting 18-20 year-olds from carrying handguns); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 386-90 (D. Mass. 2013) ("proscription against grants of licenses to carry firearms to adults under the age of twenty-one comports with the Second Amendment and imposes no burden"). These cases provide important guidance for this Court. *See Richards v. Local 134, Int'l Bhd. of Elec. Workers*, 790 F.2d 633, 636 (7th Cir. 1986) (district courts should give decisions of other circuit courts "substantial weight").

The courts in *BATFE* and *Powell* undertook the required in-depth examination of the scope of the Second Amendment at the founding. *See BATFE*, 700 F.3d at 200-03 (collecting authorities); *Tompkins*, 926 F. Supp. 2d at 385-87 (same)*; see also McCraw*, 719 F.3d at 347 (following *BATFE*). The historical sources these courts relied on – as well as other materials – establish that at the founding and thereafter, legislatures, courts, and commentators viewed firearms restrictions valid as to persons under 21 because such individuals were considered "minors" at that time and lacked the rights of adults. *BATFE*, 700 F.3d at 200-03; *Tompkins*, 926 F. Supp. 2d at 385-87. *See also* Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L. 613, 681-86 app. (2007) (age of majority remained 21 in most States until the 1970s).

At the founding, the right to bear arms was tied to the concept of the "virtuous citizen." Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995). As a result, the Second Amendment was not understood to prevent laws "'disarming the unvirtuous,'" such as criminals, or those "'deemed incapable of virtue,'" such as minors and the mentally ill. *Id.* (quoting Don B. Kates Jr., The *Second Amendment: A Dialogue*, 49 Law & Contemp. Probs 143, 146 (1986). Minors, in this context, included persons under 21, who could

not vote. *See* Reynolds, 62 Tenn. L. Rev. at 480-81 ("[T]he franchise and the right to arms were 'intimately linked' in the minds of the Framers…").

Moreover, it was common for States to restrict gun ownership by those under 21. By the end of the 19th century, 19 States (including Illinois) and the District of Columbia had laws either restricting the ability of persons under 21 to purchase or use guns or imposing similar restrictions on "minors" at a time when the age of majority was 21. *See BATFE*, 700 F.3d at 202; *see also Heller*, 554 U.S. at 605 (relying on 19th-century sources "to determine the public understanding of" the Second Amendment). Nineteenth-century courts and commentators concluded that such restrictions comported with the Second Amendment and state analogues. *BATFE*, 700 F.3d at 202-03. For example, upholding a state law prohibiting the sale of a pistol to those under 21, one state court explained: "[W]e do not deem it necessary to do more than say that we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary." *State v. Callicutt*, 69 Tenn. 714, 714 (1878). More generally, prominent judge and professor Thomas Cooley wrote that "the State may prohibit the sale of arms to minors" pursuant to its police power. *BATFE*, 700 F.3d at 203 (citing Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883)); *see also Heller*, 554 U.S. at 616-18 (relying on Cooley's treatise).

In contrast to the historical analysis set forth above, Plaintiff attempts to demonstrate that owning a firearm at age 18 was unregulated at the founding by citing the federal Militia Act of 1792, 1 Stat. 272, and a handful of related state statutes. (P.Br. at 8-9.) Plaintiff argues that because those in a militia, who could be under 21, were armed, the Second Amendment prohibits restrictions on such individuals. But none of these statutes addressed *ownership* of firearms by

minors, and the ability to bear arms in the highly-regulated context of military service is not inconsistent with conditions on the personal use and purchase of firearms, including age qualifications. The fact that minors sometimes served in the militia does not mean that the Second Amendment was understood to preclude laws otherwise restricting their access to firearms. *See BATFE*, 700 F.3d at 204 n.17 (citing *Heller*, 554 U.S. at 589-94). ("[T]he right to arms is not co-extensive with the duty to serve in the militia.").

In fact, the evidence related to militia service at the founding demonstrates that those under 21 were *not* treated as full adults even for purposes of militia service. States could and did restrict 18-20 year-olds from military service, as expressly allowed by the Militia Act. *See, e.g.,* 1 Stat. 271, Section 1, Militia Act[1] ("[E]ach and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years *(except as is herein after excepted)* shall severally and respectively be enrolled in the militia . . . .") (emphasis added); *id.* at 272, § 2 (permitting state exceptions). Thus, the Massachusetts Supreme Court concluded that "it is competent for the State legislature by law to exempt from enrolment in the militia, all persons under twenty-one and over thirty years of age." *In re Opinion of the Justices*, 22 Pick. 571, 576, 39 Mass. 571, 576, 1838 WL 280439 at **4 (Mass. 1838); *see also U. S. v. Anderson*, 24 F. Cas. 813 (C.C.D. Tenn. 1812) (No. 14,449) (granting parental habeas petition for return of son who had joined the military without parental consent when he was "about eighteen years of age").

As a result, and contrary to Plaintiff's suggestion that the Militia Act set a national, 18-year-old standard, "[t]he minimum age for militia service varied wildly across the colonies and early states, ranging from as low as sixteen to as high as twenty-one." *Tompkins*, 926 F. Supp. 2d at

---

[1]  Attached hereto for the Court's convenience as Exhibit 2.

387 n.18 (collecting statutes). Almost 40 years prior to the Militia Act, for example, Pennsylvania passed its own Militia Act of 1755, permitting individuals under 21 years old to enroll in the militia but providing "that *no youth under the age of twenty-one years*, . . . shall be admitted to enroll himself, or be capable of being enrolled, . . . *without the consent of his or their parents or guardians . . . .*" An Act For The Better Ordering And Regulating Such As Are Willing And Desirous To Be United For Military Purposes Within This Province, Nov. 25, 1755, in 3 Jared Sparks, ed., *The Works of Benjamin Franklin* 78, 82-83 (1836) (emphasis added)[2], *also available at* http://founders.archives.gov/documents/Franklin/01-06-02-0116.

Even when those under 21 did serve in the militias, Congress and state legislatures often expected them to obtain their firearms from their parents. While Congress was considering whether the United States should furnish firearms to persons unable to equip themselves, for example, Representative John Vining "asked by what means minors were to provide themselves with the requisite articles?" 2 Annals of Cong. 1854-55 (1792)[3]. Representative Jeremiah Wadsworth responded that "as to minors, their parents or guardians would prefer furnishing them with arms themselves." *Id.* at 1855-56. Likewise, when Massachusetts provided in 1784 for a militia made up of individuals ages 16 to 40, it acknowledged that minors under the control of parents or guardians were not expected to keep their own firearms. *See U.S. v. Miller*, 307 U.S. 174, 180 (1939) (citing the General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142) ("[E]very non-commissioned officer and private soldier of the said militia not under the control of parents, masters or guardians, and being of sufficient ability therefor . . . shall equip himself, and be constantly provided with a good fire arm, &c."). At the

---

[2] Attached hereto for the Court's convenience as Exhibit 3.
[3] Attached hereto for the Court's convenience as Exhibit 4.

founding, then, those under 21 did not enjoy unregulated access to arms, and as with Illinois's FOID Card Act, access to firearms was often subject to parental oversight.

Finally, resolution of the Second Amendment's scope is not limited to an examination of founding-era history. Gun regulations "need not mirror limits that were on the books in 1791" in order to be valid. *Skoien*, 614 F.3d at 641; *see also BATFE*, 700 F.3d at 196 ("regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue"). Indeed, *Heller* described prohibitions on gun ownership by felons and the mentally ill as "longstanding" and "presumptively valid," despite the fact that "current versions of these bans are of mid-20th century vintage." *BATFE*, 700 F.3d at 196. As a result, courts have upheld statutes as encompassing "longstanding" prohibitions while relying on 20th-century comparisons. In *Skoien*, for example, the Seventh Circuit relied on laws enacted in the 1930s and 1960s to uphold restrictions on gun ownership by people convicted of misdemeanors involving domestic violence. 614 F.3d at 640-41 (citing Federal Firearms Act, c. 850, § 2(f), 52 Stat. 1250, 1251 (1938); Pub.L. 87-342, 75 Stat. 757 (1961); Pub.L. 90-618, 82 Stat. 1213, 1220 (1968)).

Contemporary gun restrictions for those under 21 have a similar pedigree. In 1968, the federal government restricted sales of handguns to anyone under 21, Pub. L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 226, 230, and that law stands today. *See* 18 U.S.C. § 922(b)(1), (c)(1). Nor are restrictions on gun purchases, ownership, or possession by 18-20 year-olds at all unusual in the States. *Compare Heller,* 554 U.S. at 629 (unconstitutional District of Columbia law was unusual). As evidenced by *McCraw* and *Powers*, such restrictions exist in States as geographically and culturally disparate as Texas and Massachusetts and can be found in at least 11 States and the District of Columbia. *See, e.g.,* Conn. Gen. Stat. §§ 29-34(b), 29-37a(b)(2) (prohibiting transfers of certain firearms); Del. Code tit. 24, § 903 (prohibiting sales of certain

firearms); D.C. Code § 7-2502.03 (firearm registration prohibited without parental or guardian consent and assumption of civil liability); *id.* at § 22-4507 (prohibiting sales of pistols unless seller is parent or guardian); Haw. Rev. Stat. § 134-2(d) (prohibiting firearm permit for citizens under 21); Iowa Code Ann. § 724.22 (transfer of certain firearms prohibited without direct supervision of parent, guardian, or spouse over 21-years;); Md. Code Ann., Pub. Safety, §§ 5-117.1(d)(1), 5-134(b)(1) (prohibiting transfers of certain firearms); *id.* at § 5-118(b)(3)(i) (prohibiting firearm permit); *id.* at § 5-133(d) (generally prohibiting possession of regulated firearms; exception for parental consent); Mass. Gen. Laws Ann. ch. 140, § 131(d)(iv) (prohibiting license to carry firearms); N.J. Stat. Ann. § 2C:58-6.1(a)–(b) (prohibiting possession or use of handguns without supervision of parent, guardian, or other registered person over 21; exceptions for military service, competitions, hunting, or official duties); N.Y. Penal Law § 400.00(1)(a) (McKinney 2014) (prohibiting firearm licenses; exception for those honorably discharged from military service); Ohio Rev. Code Ann. § 2923.21 (prohibiting transfer of handguns; exception for supervision by a "responsible adult"); R.I. Gen. Laws §11-47-35(a)(1) (prohibiting sales of handguns). While the precise contours of each State's law vary, as appropriate in our federal system, Plaintiff is simply wrong when she argues that Illinois's law is "an aberration by national standards," (P.Br. at 7).

**B.    Alternatively, Section 4(a)(2)(i) of the FOID Card Act Satisfies Means-End Scrutiny.**

**1.   The Court Should Apply Intermediate Scrutiny to Plaintiff's Second Amendment Challenge.**

Even if the Court concludes that section 4(a)(2)(i) of the FOID Card Act implicates the Second Amendment, it should uphold the statute because it passes "means-end" scrutiny, under which "the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Ezell*, 651 F.3d at

703; *see also* BATFE, 700 F.3d at 206-07. Here, intermediate scrutiny is appropriate for a number of reasons. For one, the restrictions are not a total ban on gun ownership by those under 21. In addition, the law imposes only temporary restrictions and conditions that the subjects will soon age out of. Indeed, courts that have considered the appropriate level of scrutiny for age-based gun restrictions have applied intermediate scrutiny. *See, e.g., BATFE*, 700 F.3d at 207 ("[T]he temporary nature of the burden reduces its severity."); *Tompkins*, 926 F. Supp. 2d at 393; *People v. Alvarado*, 964 N.E.2d 532, 547-48 (Ill. App. Ct., 1st Dist. 2011). And the Seventh Circuit has applied intermediate scrutiny to other categorical restrictions on gun ownership, such as laws prohibiting gun ownership by convicted felons, *U.S. v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010), and by domestic violence misdemeanants, *Skoien*, 614 F.3d at 642.

Nevertheless, Plaintiff argues for strict scrutiny, citing *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1967), and *U.S. v. Booker*, 644 F.3d 12 (1st Cir. 2011). But in neither case did the court apply strict scrutiny. In *Danforth*, while acknowledging that minors have some constitutional rights, the Supreme Court "recognized that the State has somewhat broader authority to regulate the activities of children than of adults." 428 U.S. at 74. The Court then invalidated a state statute conditioning abortions on parental consent, not because the statute flunked strict scrutiny, but because the statute did not serve a "significant state interest." *Id.* at 75.[4]

---

[4] Not only is Plaintiff wrong about the level of scrutiny applied in *Danforth*, but she fails to recognize the ways in which a parental consent requirement for abortion is different from gun ownership. For one thing, there is an urgency to the decision of whether to have an abortion that is absent here. For another, *Heller* suggested that part of the right protected by the Second Amendment is a parent's right to teach his children how to use firearms. 554 U.S. at 619 (quoting B. Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880)) ("'No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and *in due time teaches his sons to do the same*, exercises his individual right.'") (emphasis added). In any event, even if laws requiring minors to have parental consent in order to obtain an abortion were analogous here (and they are not), the Supreme Court has sustained such laws when they provide an alternative (or a bypass, in the terminology of the cases) – just as the FOID Card Act does through its appeals process. *See Planned Parenthood of Se. Pa. v.*

13

More specifically, the Court emphasized that the State had failed to provide a "sufficient justification for the restriction." *Id.* These formulations do not articulate strict scrutiny.

Plaintiff's reliance on *Booker* is even further afield. In that case, which involved a challenge to a ban on gun possession by domestic violence misdemeanants, the First Circuit declined to apply strict scrutiny despite being urged to do so. *See* 644 F.3d at 25. The court instead required "a substantial relationship between the restriction and an important governmental objective" – the intermediate scrutiny standard as set forth by the Seventh Circuit. *Id.* (citing *Skoien*, 614 F.3d at 64). Plaintiff cites no authority applying strict scrutiny in an analogous context, and existing authority fully supports the application of intermediate scrutiny here.

## 2. Section 4(a)(2)(i) Survives Intermediate Scrutiny.

Under intermediate scrutiny, "the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Williams*, 616 F.3d at 692. Put another way, a categorical restriction based on age may be justified by showing "a reasonable fit between the law and an important government objective." *McCraw*, 719 F.3d at 347. The requisite "fit" between the legislature's ends and the means chosen to accomplish those ends need not be perfect and need not be the single best disposition. *See Woollard v. Gallagher*, 712 F.3d 865, 878-79 (4th Cir. 2013). The chosen means simply must be one whose scope is in proportion to the interest served. *See id.* The age restrictions at issue here easily survive intermediate scrutiny.

### a. The State has two important interests at stake.

The State's first and most important interest is in protecting the public safety by restricting firearm possession to responsible persons. *See Skoien*, 614 F.3d at 642 ("no one doubts that . . .

---

*Casey*, 505 U.S. 833, 899 (1992) (joint op.); *Planned Parenthood Ass'n of Kansas City v. Ashcroft*, 462 U.S. 476, 490-91 (1983); *see also Zbaraz v. Madigan*, 572 F.3d 370, 379 (7th Cir. 2009).

preventing armed mayhem . . . is an important governmental objective"). Illinois therefore disqualifies a variety of types of individuals from gun ownership. 430 ILCS 65/4(a)(2).

Despite the State's efforts, death, injury, and property damage all sometimes occur due to firearm use. When such damage occurs, the State has the additional important interest in ensuring that compensation is available to the victims. This interest is analogous to the State's interest in making sure that car owners carry a minimum amount of liability insurance; cars, like guns, have inherent dangers.

  **b.  Restricting, but not prohibiting, possession of firearms for individuals under 21 is substantially related to the State's important interests.**

Courts considering laws akin to the FOID Card Act have consistently held that they satisfy intermediate scrutiny because of legitimate concerns about violent crimes. In *BATFE*, for example, the Fifth Circuit noted congressional findings that "'minors [under the age of 21] account for 64 percent of the total arrests'" for serious crimes. 700 F.3d at 208 (quoting S.Rep. No. 90–1097, at 77). "[M]inors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault, and 21 percent of the arrests for murder." *Id.* The court noted Congress's concerns that firearms be kept out of the hands of "emotionally immature, or thrill-bent juveniles and minors [under 21] prone to criminal behavior." *Id.* The court also cited extensive research and data showing that 18-20 year-olds account for a disproportionately high percentage of arrests for violent crimes, that "[a]mong murderers, 18-20 year-olds were more likely to use a firearm than adults 21 and over," and that "modern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over." *Id.* at 209-10 & nn.20-21.

Similarly, in *Alvarado*, the Illinois Appellate Court sustained the State's aggravated unlawful use of a weapon ("AUUW") statute, which criminalized the carrying of handguns by

persons under 21 years old. 964 N.E.2d at 546-49. (Aspects of the Illinois AUUW statute

subsequently were held unconstitutional on other grounds by *Moore v. Madigan*, 702 F.3d 933

(7th Cir. 2012)). The court noted that the statute was not a total ban, but involved age limits while

preserving exceptions and exemptions, similar to the FOID Card Act, for young adults to engage in

lawful activities such as hunting and target shooting. *Alvarado*, 964 N.E.2d at 546-48. The court

then held that the legislature was justified in treating individuals under 21 differently from adults:

> Comments made during the legislative debates indicate that the legislature
> recognized that it was treating adults under 21 years of age differently in order to
> "recognize the activity of gang members or young kids in certain parts of the state
> that are active in gangs" and address the concern that gang members should be one
> of the groups targeted by this legislation. 91st Ill. Gen. Assem., House Proceedings,
> April 10, 2000, at 54–55 (statements of Representative Cross).
>
> We conclude from that discussion that the legislature sought to deter 18-to-20
> year-old adults from carrying handguns, which threaten both the public and police
> officers, because the 18-to-20-year-old group was heavily at risk for illegal
> gang-related activity. Furthermore, that age group was more likely to be directly
> interacting with and, thus, endangering juveniles. We find that the challenged
> provision serves a substantial and important government interest to reduce in this
> state the armed violence and illegal activity of street gangs and others by preventing
> those under 21 years of age from carrying handguns in public, except in certain
> limited circumstances.

964 N.E.2d at 548-49.

Additional data support these conclusions. According to the FBI, in 2011, 18-20 year-olds

accounted for more than 13.2% of charges issued for violent crimes (murder, non-negligent

manslaughter, forcible rape, robbery, and aggravated assault), U.S. Dep't of Justice & Fed.

Bureau of Investigation, *Crime in the United States 2011*, Table 38: Arrests by Age, available at

http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/

table-38 (last visited Feb. 5, 2014) (hereinafter, FBI, *Arrests by Age*), despite the fact that they

constituted only 4.1% of the total population in 2009. *BATFE*, 700 F.3d at 210 & n.20 (explaining

calculation of percentage of population and noting similar FBI statistics from 2009). Where weapons violations are concerned, 18-20 year-olds are even more likely to commit crimes when compared to other age groups. FBI, *Arrests by Age.* And an earlier federal report found that in 1997, 24% of gun homicides were committed by 18-20 year-olds. U.S. Dep't of the Treasury & U.S. Dep't of Justice, *Gun Crime in the Age Group 18-20*, at 2 (June 1999) (cited in *BATFE*, 700 F.3d at 210); *see also BATFE*, 700 F.3d at 209-11 (reporting additional statistics).

Moreover, scholarly research establishes that 18-20 year-olds lack maturity and impulse control. The last part of the brain to mature, the frontal lobe and, more specifically, the prefrontal cortex, continues to develop into the late 20s, and is the part of the brain associated with high-order mental processes like impulse control and decision-making. *See* Laurence Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*. Dev. Rev. 2008 March, at 13–20;[5] Angela Ciccia, Peter Meulenbroek, & Lyn Turkstra, *Adolescent Brain and Cognitive Developments: Implications for Critical Assessment in Traumatic Brain Injury*, Top. Lang. Disorders Vol. 29, No. 3, at 249, 253;[6] Nitjin Gotgay, et al., *Dynamic Mapping of Human Cortical Development During Childhood Through Early Adulthood*, 101 Proc. Nat. Acad. Sci. U.S.A. 8174, 8174, 8176-77 (2004).[7]

---

[5]  Attached hereto for the Court's convenience as Exhibit 5.
[6]  Attached hereto for the Court's convenience as Exhibit 6.
[7]  Attached hereto for the Court's convenience as Exhibit 7.

Scholarly research also makes the connection between this lack of maturity and the increased likelihood of criminal activity. One study specifically looked at maturity as it relates to delinquency in relevant age groups. *See* Kathryn Modecki, *Addressing Gaps in the Maturity of Judgment Literature: Age Differences and Delinquency*, 32 Law Hum. Behav. 78, 78–80, 88–90 (2008).[8]  Modecki's study divided participants into four categories: adolescents (14-17), college students (18-21), young adults (22-27), and adults (28-40). The older the group, the more mature they were, and lack of maturity predicted delinquency, even when all other factors were controlled for. *Id.* at 88–90. Adults showed more temperance (ability to control their actions) than adolescents, college students, and young adults. *Id.* at 89. Finally, adults and young adults engaged in less delinquency than adolescents and college students. *Id.* In other words, individuals ages 18-20 are less mature and more likely to engage in crime than their counterparts just a few years older.

### c.  Section 4(a)(2)(i) is a reasonable response to the dangers posed by allowing unrestricted possession of firearms by individuals under 21 years old.

The provision challenged here has a reasonable fit to the State's important governmental interest in maintaining public safety, preventing violent crime, and compensating victims. As noted above, individuals aged 18-20 are disproportionately more likely to commit crimes, including violent crimes, and to use firearms in the commission of those crimes. These individuals also are more likely to interact with juveniles, thereby placing juveniles at risk of gun violence as well. *See Alvarado*, 964 N.E.2d at 548. And those under 21 are less likely to have assets sufficient to compensate victims of gun violence or to carry liability insurance than are those who are older. To address these risks, the legislature crafted restrictions based on the age of the individual and

---

[8]  Attached hereto for the Court's convenience as Exhibit 8.

required parents and guardians to assume liability for injuries caused by their children's firearm use. These restrictions are limited in time, as persons falling under their purview will quickly age out. The restrictions also are limited in scope, as exceptions are allowed, both for such activities as hunting and competitive shooting, 430 ILCS 65/2(14), (16), and for those who successfully appeal to the Director, 430 ILCS 65/10(c).

No doubt there are individuals aged 18-20 who have reached the level of maturity necessary for responsible possession and use of firearms without parental involvement. There are many who have not, however. Likewise, some individuals under 16 are capable of responsibly operating a motor vehicle, certain individuals under 21 can drink alcohol responsibly, and some convicted felons can be trusted with firearms. Yet, the line must be drawn somewhere, and the legislature "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons." *Skoien*, 614 F.3d at 641. By requiring those under 21 to have the written consent of a parent or guardian or to appeal to the Director to obtain a FOID card, the Illinois General Assembly both provided for individualized assessments of their maturity, permitted 18-20 year-olds to possess and use guns in contexts unlikely to result in the guns being used for criminal purposes, and increased the likelihood that victims of their firearm use would be compensated. Section 4(a)(2)(i) therefore substantially serves the State's important interests and survives intermediate scrutiny.

### 3. Section 4(a)(2)(i) survives strict scrutiny.

Even were this Court to apply strict scrutiny to the Act's restrictions on gun ownership by those under 21, the statute is constitutional. Strict scrutiny requires that the law at issue be narrowly tailored to serve a compelling government interest. *Ezell*, 651 F.3d at 707. The legislature's concerns about public safety and preventing violence are unquestionably compelling

19

government interests. Moreover, the statute, with its individualized appeals process, is indeed "narrowly tailored," as it allows young people with the requisite maturity, even if they lack parental oversight, to obtain FOID cards.

## CONCLUSION

This Court should find that Plaintiff's claims are not justiciable or appropriate for review at this time. In the alternative, this Court should hold that restrictions on the possession of firearms by individuals under the historical age of majority (21 years old) are consistent with longstanding regulation of gun ownership and are therefore constitutional. Alternatively, the Court should uphold the constitutionality of the FOID Card Act's age-based restriction as substantially related to the government's important interests in maintaining public safety, preventing violent crime, and compensating victims, or as meeting the requirements of strict scrutiny.

WHEREFORE, Defendant requests this honorable Court enter judgment in Defendant's favor and against Plaintiff.

Respectfully submitted,

LISA MADIGAN, Attorney General,
State of Illinois
Attorney for Defendant

By: s/ Joshua D. Ratz
      Joshua D. Ratz, #6293615
      Assistant Attorney General
      500 South Second Street
      Springfield, Illinois   62706
Joshua D. Ratz, #6293615      (217) 782-9094   Phone
Adam Lipetz, #6313363      (217) 524-5091   Fax
Assistants Attorney General      E-Mail:   jratz@atg.state.il.us
500 South Second Street
Springfield, Illinois   62706

Of Counsel.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS DIVISION

TEMPEST HORSLEY,                     )
                                     )
                     Plaintiff,      )
     vs.                             )          No. 13-321
                                     )
JESSICA TRAME, in her official       )
capacity as Chief of the Firearms    )
Services Bureau,                     )
                                     )
                     Defendant.      )

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2014, the foregoing document, Memorandum of Law in

Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's

Cross-Motion for Summary Judgment, was electronically filed with the Clerk of Court using the

CM/ECF system which will send notification of such filing to the following:

Thomas G. Maag
tmaag@maaglaw.com

and I hereby certify that on February 5, 2014, a copy of the foregoing document was mailed by

United States Postal Service, to the following non-registered participant:

None.

                              Respectfully Submitted,

                              s/ Joshua D. Ratz
                              Joshua D. Ratz, #6293615
                              Assistant Attorney General
                              500 South Second Street
                              Springfield, Illinois   62706
                              (217) 782-9094   Phone
                              (217) 524-5091   Fax
                              E-Mail:   jratz@atg.state.il.us